Filed 10/3/13  P. v. Martinez CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B242591 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA076492) |
| v. | |
| SEAN MATTHEW MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teri Schwartz, Judge.  Affirmed.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

This appeal arises out of a shooting on April 11, 2009, in which two young men were killed and four others were injured. The shooter, Vincent Casio, who was the subject of a separate appeal, was convicted of two counts of murder (Penal Code § 187, subd. (a)),[1] four counts of premeditated attempted murder (§§ 664, 187, subd. (a)), and possession of a firearm by a felon (§ 12021, subd. (a)(1)). In the same trial, defendant and appellant Sean Matthew Martinez was convicted as an aider and abettor of two counts of second degree murder (§ 187, subd. (a)) and four counts of premeditated attempted murder.[2] The jury found true allegations that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (b)-(e)). Defendant was sentenced to 40 years to life in state prison.

A defendant may be liable under an aiding and abetting theory in two ways: he may be found to have possessed the necessary mental state to be guilty of the crime the perpetrator committed, or guilty of both the crime the perpetrator intended to commit (target offense) and any crime that is a natural and probable consequence of the intended crime (non-target offense). (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) Throughout the trial, the prosecution proceeded on the theory that defendant possessed the necessary mental state to be guilty of murder and attempted murder as an aider and abettor, choosing not to rely on a natural and probable consequences theory. The jury was instructed accordingly. During deliberations, however, the jury sent questions to the trial court concerning whether it would be permissible to convict defendant if the crime defendant intended to aid and abet was not murder or attempted murder, but instead an uncharged crime. After discussion with counsel outside the presence of the jury, the trial court elected to instruct under Judicial Council of California Criminal Jury Instructions (2010) CALCRIM No. 403 (Natural and Probable Consequences (Only Non-Target

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Defendant and Casio were both found not guilty of false imprisonment by violence (§ 236) in counts 7 and 8.

Offense Charged)), identifying the target crime as assault with a deadly weapon or by means likely to produce great bodily injury. The court permitted both sides to address the new instruction to the jury.

Defendant contends: 1) there is insufficient evidence to support the convictions on a direct aiding and abetting theory; 2) the natural and probable consequences instruction was given in error because it was not supported by the evidence; 3) defendant was prejudiced by the natural and probable consequences instruction because he had inadequate notice that the instruction would be given and was denied the right to present a complete defense; 4) the jury was coerced into rendering guilty verdicts because it was instructed on natural and probable consequences in the midst of deliberations; and 5) the jury's findings of premeditation on the attempted murder convictions were not pled and must be stricken. Defendant alternately requests that, if the judgment is affirmed, the trial court be ordered to amend the awards of direct victim restitution to reflect the imposition of joint and several liability.

We affirm the judgment in its entirety.

## FACTS

### *The Shootings*

On April 11, 2009, Christina Sanchez rented a room at the Knights Inn in Rosemead for her brother Anthony Gonzalez's sixteenth birthday party. The guests at the party included Jessica Boyle, Betty Fontenot, Francine Ortega, Richard Herrera, Toumaria Harris, Armando Davila, Raudel Ceballos, Gustavo Delatorre, and Angel Guerrero. When Sanchez, Gonzalez, and Davila arrived at the motel, approximately 15 people were already in the room. Less than an hour later, Sanchez let Richard Logan, whom she had gone to high school with, into the room. Defendant and Casio arrived together a little later. Sanchez did not want to let defendant and Casio in because she did not know them or like the way they looked, but she relented because Logan knew them.

3

Several of the guests described defendant and Casio as looking like gangbangers, which made them uncomfortable.

Gonzalez told defendant and Casio that if they had any problems at the party, they should talk to him and he would take care of things. At some point, Casio called Harris a highly offensive racial epithet. Gonzalez reminded defendant and Casio that he had asked them to come to him if they had a problem and not to start any trouble. One of them apologized.

Defendant and Casio remained at the party for about an hour to an hour and a half and left. They returned about an hour later. Casio had a bandana tied over his mouth. Casio pointed a gun at the balcony, where Gonzalez, Delatorre, Ceballos, Harris, and Davila were standing and told Guerrero, who was on the bed, to get on the balcony with them. Casio walked behind Guerrero, telling him to get outside. Logan ran toward the balcony and jumped over the edge. The balcony was high. Delatorre tried to stop Casio from corralling people onto the balcony, but Casio shot him in the face. More than ten shots were fired. Some of the guests testified that defendant was by the door during the shooting, and they heard him telling Casio to hurry out of the room when the shooting ceased. Herrera was in the bathroom when the shooting began. He opened the door, but immediately went back inside, along with Sanchez, after either Casio or defendant yelled at him to go back into the bathroom. Guerrero and Delatorre were killed in the gunfire. Gonzalez, Harris, Davila, and Ceballos were injured.

A motel patron heard the gunshots and went outside to see what was going on. He saw people running, one of whom was a male with a bandana covering his face. One of the people running said, "This is a hood thing. Get back in your room."

### Statements by Jaki Arteaga

On April 21, 2009, Los Angeles County Sheriff's Detective Richard Ramirez and Sergeant Edward Godfrey conducted an interview with Jaki Arteaga, which the prosecution introduced at trial. Arteaga was originally a codefendant in the case, but he

4

pled guilty as an accessory after the fact before the preliminary hearing.  Arteaga stated that he picked up defendant on the night of the shooting and the two drove around for a while before picking up Casio, who was one of defendant's "homies."  Arteaga dropped the two men off at a motel.  Before getting out of Arteaga's truck, defendant told Arteaga that he was going to "squabble with some fools."  Later, defendant called Arteaga again and asked him to return to the motel to pick them up.  Defendant told Arteaga that "the homies are here with some puss from Lomas" and instructed him to leave the truck running.  While he was waiting in the parking lot, Arteaga heard gunshots and drove away.  He stopped when he saw defendant and Casio, right behind defendant, to let them into the truck.  As they were driving away from the scene, either Casio or defendant threw a gun clip out of the truck.  Arteaga dropped them off together and went home.  At trial, Arteaga testified after the judge told him he would be held in contempt if he refused.  He denied many of his statements at the interview.

*Expert Testimony*

San Gabriel Police Detective Fabian Valdez, the prosecution's gang expert, testified regarding the Sangra gang.  The motel in which the shooting took place was within Sangra territory.  Detective Valdez said that members of Sangra "ha[d] been arrested for a multitude of crimes," including assault with a deadly weapon, auto theft, homicide, and robbery and witness intimidation.  Lomas was its primary rival.  Sangra members did not "get along" with Blacks.

Both Casio and defendant were documented as gang members, although police had fewer prior contacts with defendant than with Casio.  Their names appeared in Sangra "roll calls"—lists of Sangra members written on building walls.  Logan was a prolific "tagger" for Sangra and associated with the gang with hopes of becoming a member.  Logan's father was a Sangra member.  Detective Valdez opined Casio was a member of Sangra based on Casio's tattoos, his dress, demeanor, and his admission that

5

he was a member of Sangra.  Valdez had known Casio for approximately ten years and knew his moniker was "Boy," and that he was the "shot caller" of the Sickos clique.

Given a hypothetical situation based on the facts presented at trial, Detective Valdez opined the shootings were gang-related because Hispanic gangs do not tolerate Blacks and there were gang members or associates at the party whom the host chastised for making a derogatory remark about a Black guest.  The shooting was intended to avenge the disrespect because tolerating disrespect was a sign of weakness.  Respect was "everything" in gang culture, and gang members had to be willing to die and kill for it.  The gang's status as a whole was at stake, and if the disrespect was not avenged, other gangs would attack members due to the perceived weakness.  A gang also maintained its reputation by terrorizing the community, so that people would be afraid to report crimes committed by the gang.  Gang members were like brothers, who would back each other up in a fight, and go so far as to kill to protect each other.

### Defendant's Testimony

Defendant testified on his own behalf.  He admitted to being a member of Sangra since the age of 15 and had known Casio for about a year prior to the shooting.  On the night of the shooting, defendant was with Arteaga.  They were driving around in Arteaga's truck deciding what to do, when Casio called and said he was stranded.  Since gang members do not leave fellow gang members in enemy gang territory, Arteaga drove and picked Casio up.  Casio got a call from Logan, AKA "Little Tricky," who told him about the party at the motel in Rosemead.  They decided to go because Logan wanted to join the Sangra gang, and defendant wanted to test his loyalty by fighting with him.  It was important to fight for the gang and to know that members will back each other up in a fight.  When they pulled into the motel, defendant asked Arteaga to stay.  Instead, he agreed to pick defendant up later.

Logan let defendant into the room.  Once inside, defendant "challenged" Logan by asking questions intended to get him to fight.  Logan just responded "Okay," which was

6

not appropriate. Gang members were expected to show readiness and interest in fighting to prove their loyalty.

Defendant and Logan went to the balcony, while Casio went to the bathroom to use cocaine given to him by defendant. Defendant and Delatorre, who was also on the balcony, discussed where they were from. Defendant said he was from Sangra, and Delatorre said he belonged to a motorcycle gang. Defendant did not feel any tension between them. Casio came over and told defendant he wanted to "go get"—i.e., steal—a car. Defendant, Casio, and Logan then went to the sink by the bathroom and used cocaine. While they were at the sink, Harris came out of the bathroom and leaned over Casio and spit in the sink; Logan told Harris to "watch where you spit around my homeboy." Defendant thought there was going to be a fight. Defendant did not want to fight and was angry that Logan confronted Harris because if Logan started a fight, defendant and Casio would have to back him up. Logan then asked Harris if he had a problem, and they stared at each other. Harris left, bumping Casio with his shoulder. Casio said he was going to get the car, and defendant wanted to leave because he did not trust Logan.

Defendant left the party with Casio and two other males. Casio said there was not enough room and told defendant to stay at the motel. He said he would come back for him. Defendant went back to the party. Defendant talked to Logan for about 15 minutes and then called Arteaga to pick him up.

Casio appeared in the doorway. Defendant asked Casio if he had a car, and he said no. Defendant told him Arteaga was picking him up. They were walking toward the door when Casio told defendant to "be ready" and pointed to a gun. Casio often carried a gun because people wanted to kill him. Defendant was armed with a knife because gang members often engage in violence and may need to defend themselves from rival gang members. Although he came to the motel because he "intended to engage in gang behavior," and knew Casio "wanted to do something," when Casio said "be ready," defendant thought he meant he should be ready to leave.

7

Casio put a bandana around his face. Defendant did not know what Casio was planning to do, but when he saw Casio reach into his waistband, he thought Casio was going to rob someone. Defendant was confused and stood by the door to see what would happen. He heard shots and panicked, so he reached for his pocket knife. He held the knife out and told Sanchez to "get the fuck in[to the bathroom]." He was afraid she would be shot. Sanchez ran in and the door closed behind her. Defendant saw Casio running toward the bathroom so he said, "Let's get the fuck out of here." They both ran. Defendant saw Arteaga speeding out of the parking lot, so he waved him down, and he and Casio jumped into the truck. Casio told defendant, "You're coming with me." Defendant was afraid Casio would shoot him if he got out of the truck.

Casio told Arteaga to drop them off at his stepfather's house. Casio told his stepfather that he lined up people on a balcony and killed five of them. Defendant was afraid because Casio was shooting up cocaine and had track marks on his arm. He thought Casio might kill him. Another gang member showed up and Casio bragged about the shooting. Casio's stepfather helped them dispose of their clothes and cell phones. Defendant gave Casio $100 to get him a new cell phone. At some point, defendant checked the magazine of Casio's gun and saw ammunition. Defendant stayed until Casio locked himself in his room. He walked to the bus stop and called his brother for a ride.

Defendant did not call or talk to the police after his arrest because gang members who snitched got killed, but he told officers everything after he was arrested.

8

## I. *Denial of Motion to Dismiss/Direct Aiding and Abetting*

After presenting the testimony of the first defense witness,[3] trial counsel moved for acquittal under section 1118.1 on the ground there was insufficient evidence to support defendant's convictions under a direct theory of aiding and abetting.[4] Defendant challenges the trial court's denial of the motion. There was no error.

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 (*Cole*).) "'"[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."' [Citation.] 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the

---

[3] Defendant had not yet testified in his own defense.

[4] Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

"In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, '"whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." [Citations.]' [Citation.] 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' [Citation.]" (*Cole*, *supra*, 33 Cal.4th at pp. 1212-1213.)

Under a direct theory of aiding and abetting, the defendant must have known and shared the perpetrator's murderous intent to be found liable. (See *McCoy*, *supra*, 25 Cal.4th at pp. 1117-1118; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) The aider and abettor shares the perpetrator's specific intent when ""'"the accomplice 'knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating [the killing].'"'" [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164, quoting *McCoy*, *supra*, at pp. 1117-1118.) Although mere presence at a crime scene does not suffice to establish aiding and abetting, acts tending to demonstrate aiding and abetting include "presence at the scene . . . , companionship, and conduct before and after the crime, including flight." (*People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.) Those factors, among others, weigh heavily against defendant in this case.

The facts support the findings that defendant knew Casio planned to kill his victims, shared his intent, and aided and encouraged him. Defendant and Casio belonged to the same gang. They arrived at the party together, stayed in one another's company during the party, and left together. Defendant was present when Gonzalez confronted Casio and chastised him publicly about his racial slur against Harris. An expert testified that within gang culture, Gonzalez's action would be considered disrespectful. Disrespect against one gang member requires retribution, and fellow gang members are

10

expected to back up a disrespected member in an altercation. Defendant was with Casio at the scene during the shooting, and two witnesses testified he was positioned by the door. Casio put a bandana over his face, walked straight into the room, corralled the victims onto the balcony, and immediately opened fire without provocation. The jury could reasonably infer that both men knew what was going to happen as they entered the room, and that defendant was blocking the exit to deter anyone from trying to escape while Casio carried out the shooting. Defendant and Casio fled the motel room together, and as they left, one of them told an onlooker, "This is a hood thing. Get back in your room," indicating that the two of them were working together in a gang-related altercation.

Evidence was presented that defendant arranged transportation for himself and Casio to and from the motel. Arteaga told the police that defendant called to ask Arteaga to drop them off at the motel and later called for Arteaga to pick them up.[5] Defendant told Arteaga he was going to "squabble with some fools"; "homies are here with some puss from Lomas," a derogatory reference to a rival gang; and to leave the truck running when he got to the motel, from which it could be inferred that defendant and Casio planned to leave the area rapidly, and likely for a nefarious purpose. The timing of the pick up was also suspect. The shooting took place just after Arteaga arrived at the motel. Moments later, defendant jumped a fence at the motel and ran to Arteaga's moving truck. Defendant waved Casio into the truck as well, and one of them disposed of a gun magazine while Arteaga was driving. Arteaga dropped defendant and Casio off at the same location.

---

[5] Defendant argues that Arteaga's testimony must be corroborated because he was an accomplice. However, Arteaga pled guilty as an accessory after the fact before the preliminary hearing, and an accessory is not an accomplice, nor does the testimony of an accessory require corroboration. (*People v. Boyer* (2006) 38 Cal.4th 412, 466-467.) Moreover, as the Attorney General emphasizes, the defense opposed identifying Arteaga as an accomplice in the instruction regarding the necessity of corroboration of accomplice testimony and has forfeited the right to complain of its tactical decision at this juncture. In any event, the record contains abundant corroboration of Arteaga's testimony and statements.

The prosecution presented solid, credible evidence of defendant's guilt as an aider and abettor. The motion to dismiss was properly denied.

## II. *Contentions Relating to the Natural and Probable Consequences Theory*

### A. Procedural Background

Prior to defendant's testimony, the trial court and counsel had a conference on jury instructions. The prosecutor considered presenting the natural and probable consequences doctrine using the target offense of assault with force likely to produce great bodily injury based on defendant's statement to Arteaga that he intended to "squabble with some fools." After reviewing CALCRIM No. 403, however, he decided against it, stating: "I think it's just a really complicated instruction. And if I don't have to use it, I won't." The court agreed not to give CALCRIM No. 403 based on the prosecutor's tactical decision.

After the conclusion of defendant's testimony in another discussion outside the presence of the jury, the prosecutor said: "One thought that just hit me with regard to instructions, there were two concepts that arose today. One was the idea of natural and probable consequences, but I'm not going to request that. I don't think it quite got to that state."

The trial court instructed the jury only on direct aiding and abetting. Counsel made closing arguments, and the jury commenced deliberations on December 13, 2011. Outside the presence of the jury on December 15, 2011, the court advised the parties that the previous day, the jury asked the following question: "'The jury instruction refers to "the crime." Are we limited in considering "the crime" as only the crimes listed in charges 1 through 8. Please elaborate.'" Because Casio was the only defendant charged in count 9, the court asked the jury for a clarification. The jury responded: "'Clarification on applying the jury instruction 401 aiding and abetting. The jury instruction refers to 'the crime.' Are we limited to considering the charges 1 through 8.

12

There was testimony from [defendant] indicating a possible robbery. Can we consider this speculated robbery scenario that escalated to the resulting charges as the crime even though it is not among the listed charges?'" The court observed the jury's clarifying question related to the natural and probable consequences theory of aiding and abetting, which the prosecutor opted not to argue for tactical reasons, and which the jury had not been instructed upon. The parties discussed the issue at length, and agreed not to refer to the natural and probable consequences doctrine in response to the jury's question. The jury was provided with the response: "'While all evidence may be considered by you to find the defendant guilty of the crimes charged in counts 1 through 8, you must find that the defendant intended to and did assist in the commission of those crimes.'" The jury recommenced deliberations.

On December 16, 2011, the jury requested, and was provided, read back of Ceballos's testimony covering the period shortly before the crime through shortly after the crime. On December 20, 2011, the jury was provided read back of Fontenot's testimony from shortly before the crime through shortly after the crime. Thereafter, the jury reached verdicts on all counts related to Casio and on counts 7 and 8 related to defendant. Deliberations continued on January 3, 2012, as to counts 1-6, related to defendant. That day, the jury heard read back of Herrera's testimony covering the period from just before the crime to shortly after the crime.

Near the close of deliberations on January 4, 2012, the jury submitted the following note: "'Can we have a replacement verdict form for count 8. And we feel deadlocked as to counts 1 through 6.'" On January 5, 2012, the trial court questioned the jury foreperson (Juror No. 8) about the inquiry. Juror No. 8 stated the word "deadlocked" in the note meant that all 12 jurors could not agree to a decision, which was not a decision of guilty versus not guilty. The court asked: "Is there another question that needs to be presented to the court?" Juror No. 8 replied that further clarification on the court's prior response to the jury's question regarding aiding and abetting could help with the deadlock. The other 11 jurors agreed with this assessment. Juror No. 8 stated that the court's prior response "brought more questions than answers." At the court's request, the

13

jury provided clarification of its request: "Jury instruction 401 Aiding and Abetting. We are having trouble with the language of the instruction. The instruction requires we find all four elements to be met to determine the defendant aided and abetted. We are having trouble applying the language in elements #2 and #4, specifically the language that the defendant knew 'the crimes' in counts 1-6 were going to be committed. If the defendant thought, 'a different crime,' other than the charges in counts 1-6 was going to be committed does that satisfy the elements of this instruction? If we cannot agree on Aiding and Abetting are we to move forward with voting on all counts?"

Outside the presence of the jury, the trial court assessed the situation with counsel, stating "this is the same situation we were in before." The prosecutor requested that the trial court give the natural and probable consequences instruction specifying robbery and assault with a firearm as the target offenses. Defense counsel proposed instead that the court give the jury a modified version of CALCRIM No. 401, arguing that giving the natural and probable consequences instruction violated defendant's rights to a fair trial and due process of law. The court observed that the prosecutor had twice stated he was not requesting the natural and probable consequences instruction before the case went to the jury. The court stated it should have given the instruction, despite the prosecutor's position, because substantial evidence supported it with a target crime of assault. The court recounted the following facts, which supported the theory: defendant and Casio were gang members and companions throughout the evening of the shooting, defendant intended to fight Logan to test his gang loyalty, Casio carried a gun and defendant carried a knife, a shooting occurred, and defendant testified that he stood by the door holding the knife. The court denied the prosecutor's request to instruct the jury on robbery as a target offense but agreed to instruct on assault as a target offense.

In open court, the trial court reread the jury's question and informed the jury: "In response to your question, I am going to attempt to provide further instructions that may answer that question depending upon what you find to be the facts. This was not given to you originally, nor was it presented to you in argument. However, it is an instruction that I need to give you in light of the question. And just like all the other instructions, you

14

were told that some apply and some may not depending on what you find to be the facts."
The court then instructed on the natural and probable consequences doctrine with assault
with a deadly weapon or by means likely to produce great bodily injury (§ 245, subd. (a))
as the target offense of the intended crimes of murder or attempted murder.

The prosecutor and defense gave supplemental closing arguments based on the
additional instructions. The prosecutor argued that defendant was guilty under both
aiding and abetting theories. Defense counsel argued the instructions on the natural and
probable consequences did not apply to the facts of the case.

Deliberations recommenced and continued on January 6 and 9, 2012. The jury
reached guilty verdicts on the murder and attempted murder counts on January 10, 2012.

## B. Sufficiency of the Evidence Under the Natural and Probable Consequences Doctrine

Defendant contends the trial court erred in instructing the jury on the natural and
probable consequences theory, because the theory was not supported by the evidence.
We apply the substantial evidence standard of review to this contention.

""""A person who knowingly aids and abets criminal conduct is guilty of not only
the intended crime [target offense] but also of any other crime the perpetrator actually
commits [nontarget offense] that is a natural and probable consequence of the intended
crime. The latter question is not whether the aider and abettor *actually* foresaw the
additional crime, but whether, judged objectively, it was *reasonably* foreseeable.
[Citation.]" [Citation.] Liability under the natural and probable consequences doctrine
"is measured by whether a reasonable person in the defendant's position would have or
should have known that the charged offense was a reasonably foreseeable consequence of
the act aided and abetted." [Citation.]' [Citations.]" (*People v. Favor* (2012) 54 Cal.4th
868, 874 (*Favor*).) To be reasonably foreseeable, the consequences of the perpetrator's
act """"need not have been a strong probability; a possible consequence which might
reasonably have been contemplated is enough. . . ." [Citation.]' [Citation.]" (*People v.*

15

*Medina* (2009) 46 Cal.4th 913, 920, quoting *People v. Nguyen* (1993) 21 Cal.App.4th 518, 535.) "A reasonably foreseeable consequence is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case. [Citation.]" (*Favor*, *supra*, at p. 874.)

Courts have repeatedly concluded that murder and attempted murder are a natural and probable consequence of assault by gang members. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight in which the defendant openly carried a gun was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499-500 [fatal stabbing of rival gang member either during or after fistfight was natural and probable consequence of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members], superceded by statute on another point as stated in *People v. Gibbs* (1983) 145 Cal.App.3d 794, 797.)

Defendant attempts to circumvent a similar conclusion in his case by arguing that no assault occurred. "As this court explained more than a century ago, 'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So, *any other similar act*, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of *using actual violence* against the person of another, will be considered an assault.' [Citations.]" (*People v. Colantuono* (1994) 7 Cal.4th 206, 219.) When Casio brandished his gun and forced his victims onto the balcony, the assault was

16

complete. It was reasonably foreseeable that Casio, as a gang member intending to avenge disrespect through assault with a firearm, could kill or attempt to kill his victims.[6]

Defendant also argues any intended assault was unconnected to the murders and attempted murders, such that the crimes could not have been a natural and probable consequence of the intended assault. He focuses on the possible altercation with Logan as the target offense, arguing that any animosity was remote, and that Logan was not a target of the shooting. To the contrary, defendant testified that his issues with Logan arose on the same night and within a few hours of the shooting. Defendant admitted that he planned to test Logan by fighting him, Logan responded inappropriately to his challenge, Logan irritated defendant by aggravating the incident with Harris, and ultimately he did not trust Logan—which was absolutely essential in gang culture. The evidence also tends to prove Logan was a target: Logan was on the balcony inside the area of Casio's intended range just before the shooting started, and he took drastic action to avoid being shot. Despite the fact that he was associated with Sangra, Logan did not hesitate to jump off the high balcony to the shock of others standing with him, which tends to show that he understood he was a target as soon as Casio entered the room with a gun.

Moreover, there was evidence of incidents with other guests at the party that night that would have provoked an assault. Gonzalez chastised Casio for his racial epithet in front of defendant. Harris spat over Casio's shoulder into the sink and then bumped

---

[6] Defendant endeavors to distinguish his case by asserting that, in contrast to the majority of California precedent, this case did not involve a clash between rival gang members. In fact, Arteaga stated that defendant told him there were rival Lomas members at the party, and either defendant or Casio yelled that the shooting was "a hood thing" at an onlooker, both of which suggest the shooting was against rival gang members. Moreover, evidence was presented that Casio acted to avenge disrespect, express disapproval of association with Blacks, and punish inappropriate behavior by a fellow gang member that could be viewed as disloyal. Although we need not decide the issue here, the fact that the shooting was motivated by the dictates of gang culture is evidence enough that the crimes were the natural and probable consequence of an intended assault with a deadly weapon.

17

Casio in the shoulder as he exited the bathroom when both Logan and defendant were present.  These public displays of disrespect would necessitate defendant backing up Casio if Casio chose to fight, which was likely within gang culture.  The jury could reasonably infer the incidents with Gonzalez and Harris, combined with the racial prejudice that Sangra gang members have against Blacks, were reason enough for Casio and defendant to return to the motel room and "squabble with some fools" who had disrespected them.

Additionally, defendant knew Casio had a gun, and was himself carrying a knife.  Defendant admitted he was standing by the door—the only route of escape from the room other than the balcony, which was high off the ground.  He brandished a 3 1/2-inch blade and ordered Sanchez to "get the fuck back in there" when she attempted to leave the bathroom.  Although defendant's explanations for these actions may have been less than sinister, the jury was free to accept his testimony regarding the actions and reject his explanations.  (Cf. *Stevens v. Parke, Davis & Co*. (1973) 9 Cal.3d 51, 67-68 ["'the jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.  [Citations.]'"].)

After the shooting, defendant helped Casio escape.  He dove into Arteaga's vehicle and encouraged Casio to jump into the moving truck as well, and they fled the scene together.  Together they disposed of a gun magazine and went to Casio's stepfather's house, where they destroyed their cell phones and disposed of their clothes.  Defendant checked Casio's gun for ammunition.  Although he claimed to be fearful, defendant gave Casio $100 because he wanted Casio to buy him a new phone.  The jury could reasonably find that had he wished to end their association, it is unlikely defendant would have remained with Casio after they successfully fled the scene.

In light of the substantial evidence presented, we conclude the trial court did not err in giving the natural and probable consequences instruction.

18

## C. <u>Notice of the Prosecution's Natural and Probable Consequences Theory</u>

Defendant contends that by giving the natural and probable consequences instruction during deliberations, the trial court deprived him of fair notice of the charges against him, as well as the right to present a complete defense. Because the issues involve mixed questions of fact and law, our review is *de novo*. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70 (*Quiroz*).) We conclude that notice was adequate, and that defendant had the opportunity to present a full defense.

At the preliminary hearing, which is considered to be "'the touchstone of due process notice to a defendant'" (*People v. Jones* (1990) 51 Cal.3d 294, 312), defendant was put on notice that he could be charged on an aiding and abetting theory. Evidence was presented that Casio told defendant to "get ready," defendant knew Casio had a gun, defendant watched Casio put a bandana over his mouth, and defendant decided to remain in the room by the door to the hallway. This evidence supports the theory defendant knew that either an assault or a murder would be committed, shared Casio's intention, and aided and abetted the crimes by guarding the door. Additionally, defendant was charged with two counts of murder and two counts of attempted murder, and in California, "an instrument charging a defendant as a principal is deemed to charge him as an aider and abettor as well. (§ 971.) This 'notice as a principal is sufficient to support a conviction as an aider and abettor . . . ". . . without the accusatory pleading reciting the aiding and abetting theory. . . .'" [Citations.]" (*Quiroz, supra*, 215 Cal.App.4th at p. 70.) Because the natural and probable consequences doctrine describes one type of aiding and abetting (*McCoy, supra*, 25 Cal.4th at p. 1117), defendant had adequate notice of the theory. In addition to the other evidence proffered at trial, which we discussed above, defendant's own testimony supplied much of the factual basis for a natural and probable consequences theory.

Defendant also had the opportunity to present a complete defense. As the Attorney General concedes, the prosecution chose not to rely on the natural and probable consequences doctrine for tactical reasons and represented to defendant throughout the

trial that it would not do so. The prosecution did not "ambush" or "mislead" defendant, however. It was only after the jury twice questioned the trial court concerning the law that the instruction—which was a correct formulation of the law as applied to the facts—was given.

The trial court has wide discretion concerning the timing of its instructions to the jury. (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 127 (*Ardoin*).) Section 1093, subdivision (f), provides: "At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as the judge may deem necessary for their guidance on hearing the case." Under section 1094, further instruction may be given during deliberations "for good reasons, and in the sound discretion of the Court." (See *Ardoin, supra,* at pp. 126-128.)

Here, the trial court did not abuse its discretion by giving a supplemental instruction on the natural and probable consequences theory. When questioned by the jury, the court was statutorily obligated "'to provide the jury with information the jury desire[d] on points of law.' [Citations.]" (*Ardoin*, *supra*, 196 Cal.App.4th at pp. 127-128.) It was also required to "'attempt "to clear up any instructional confusion expressed by the jury." [Citation.]' [Citation.]" (*Id.* at p. 128.) "The trial court had the further duty in the case to instruct the jury on the law relevant to the issues raised by the evidence." (*Ibid.*) Finally, "'[t]he court [was] not *precluded* from giving any instruction for which there [was] evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.' [Citation.]" [7] (*Ibid.*)

---

[7] Defendant mischaracterizes the trial court's position on whether substantial evidence supported giving the natural and probable consequences instruction. When the court and the parties discussed the instruction, there were two possible target offenses under consideration—robbery and assault with a deadly weapon. The court did not believe the instruction was supported on the theory that robbery was the target offense. It did, however, find that assault with a deadly weapon was supported and stated that it

Moreover, when the trial court instructed the jury it emphasized that, as with other instructions, the natural and probable consequences doctrine may or may not apply, and the jury was free to disregard the instruction if it was not relevant to the jury's findings. Further argument was permitted in light of the instruction, and defense counsel took advantage of the opportunity to argue the instruction did not apply to defendant's case. Defense counsel did not request to reopen the case to introduce additional evidence or request a continuance to prepare for his supplemental closing argument. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1131-1132 ["defendant waived any claim of insufficient notice by not moving to reopen when he learned that the court would instruct the jury on felony murder"]; *People v. Memro* (1995) 11 Cal.4th 786, 869 [defendant forfeited claim prosecution's felony-murder theory surprised him because he failed to move to reopen evidence].) Under these circumstances, defendant was not denied the opportunity to present a complete defense.

## D. Timing of the Natural and Probable Consequences Instruction

Defendant next contends the timing of the natural and probable consequences instruction coerced the jury into returning guilty verdicts. As we have already stated, the trial court had wide discretion to give the natural and probable consequences instruction during deliberations (*Ardoin*, *supra*, 196 Cal.App.4th at p. 127) and did not abuse its discretion in doing so. Nor was the jury coerced by the court's response to its inquiries.

"Whether statements of a trial judge amount to coercion of a verdict is peculiarly dependent upon the facts of each case." (*People v. Burton* (1961) 55 Cal.2d 328, 356, abrogated on another point by *People v. Brown* (1994) 8 Cal.4th 746, 748-750, 762-763.) "The basic question . . . is whether the remarks of the court, viewed in the totality of applicable circumstances, operate to displace the independent judgment of the jury in

determined not to give the instruction earlier because the prosecution had chosen not to rely on it.

21

favor of considerations of compromise and expediency." (*People v. Carter* (1968) 68 Cal.2d 810, 817, abrogated on other grounds by *People v. Gainer* (1977) 19 Cal.3d 835, 851-852.)

Looking at the totality of the circumstances, we conclude the jury was not coerced in this case. *People v. Stouter* (1904) 142 Cal. 146 (*Stouter*) and *People v. Jennings* (1972) 22 Cal.App.3d 945 (*Jennings*), on which defendant relies, differ from this case. In both cases, a new offense was introduced in the instructions during deliberations. (*Stouter*, *supra*, at pp. 149-151 [jury was instructed on attempted lewd act upon a child during deliberations, although he was charged and tried for lewd act upon a child]; *Jennings*, *supra*, at pp. 947-950 [jury was instructed on assault with a deadly weapon during deliberations although defendant was charged and tried for assault with intent to commit murder].) Here, the jury was further instructed on aiding and abetting the charged offenses under the natural and probable consequences doctrine. The trial court specifically verified that the jury was not "deadlocked" on the question of innocence or guilt, but needed clarification of the meaning of the instructions given. Although the jury inquired as to whether defendant could be convicted on the theory that he aided and abetted a robbery, the court designated only felony assault as the target offense, because it did not deem robbery to be a target offense supported by substantial evidence. The verdicts were reached not because the jury was pressured, but because it pursued its duty to assess the facts in light of the relevant law, stated fully and accurately, and the court fulfilled its obligation to provide complete instruction on the applicable law.

## III. *Premeditated Attempted Murder Findings*

Where it has been pleaded and proven an attempted murder was willful, deliberate, and premeditated, section 664, subdivision (a) provides for an increase in the maximum determinate term to a life sentence. (*People v. Arias* (2010) 182 Cal.App.4th 1009, 1011, fn. 2 (*Arias*).) The statute specifically requires that "[t]he additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed

unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (§ 664, subd. (a).) Additional to the pleading requirements contained in section 664, the federal Constitution requires that "the accused . . . be informed of the nature and cause of the accusation" (U.S. Const., 6th Amend.), such that he/she is afforded a reasonable opportunity to prepare a defense. (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*).) This includes fair notice of allegations that will increase the defendant's punishment, including section 664, subdivision (a) allegations. (*People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*).)

Defendant contends the jury findings of premeditation on the attempted murder charges (counts 3-6) should be stricken because the prosecution failed to plead that the attempted murders were committed with premeditation. The Attorney General does not contest the information and amended information failed to allege the attempted murders were deliberate and premeditated but contends defendant has forfeited this claim by failing to object, despite having fair notice of the allegations. We agree. Fair notice may be accomplished by various means, as was the case here. (See, e.g., *Jones*, *supra*, 51 Cal.3d at pp. 317-318.)

None of the three versions of the information against defendant included allegations that any of the four attempted murders charged were willful, deliberate, and premeditated. Before the close of its case-in-chief, however, the prosecution provided a list of jury instructions to the trial court and opposing counsel, including CALCRIM No. 601 (Attempted Murder: Deliberation and Premeditation).[8] The court discussed

---

[8] CALCRIM No. 601 provides as follows: "If you find the defendant guilty of attempted murder, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation.

"The defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and,

23

proposed modifications to CALCRIM No. 601 with counsel prior to the close of the prosecution's case. Defense counsel did not object to inclusion of the instruction.[9]

The verdict forms submitted to the jury as to counts 3-6 included the allegation that the attempted murders were done willfully and with deliberation and premeditation. The trial court asked defense counsel if there were any objections to the verdict forms. No objections were made. The jury expressly found true the allegations that the attempted murders charged in counts 3-6 were committed willfully, deliberately, and with premeditation. The prosecutor's sentencing memorandum sought imposition of a life term on all four attempted murder convictions. The court sentenced defendant to a consecutive life term on each count of attempted murder without objection.

Under these circumstances, we agree with the Attorney General the instant case is more closely analogous to *Houston*, *supra*, 54 Cal.4th 1186, than it is to *Arias*, *supra*, 182 Cal.App.4th 1009, upon which defendant relies.

---

knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting.

"The attempted murder was done willfully and with deliberation and premeditation if either [the shooter] or [both perpetrators] acted with that state of mind.

"The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

[9] The only modification made was to replace the words "the defendant or both of them" in paragraph three with "the shooter or both perpetrators."

24

In *Arias*, the information charged the defendant with two counts of attempted murder, but, as in this case, failed to allege the attempted murders were willful, deliberate, and premeditated, or to reference section 664, subdivision (a). (*Arias*, *supra*, 182 Cal.App.4th at p. 1017.) The information was never amended to include the allegations. (*Ibid*.) Without objection from either of the parties, the jury was instructed that if it found defendant guilty of attempted murder, it must then determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid*.) The verdict forms, which were also submitted to the jury without objection, did not state that the jury must make a separate finding as to whether each attempted murder was willful, deliberate, and premeditated. (*Ibid*.) Instead, the verdict forms required the jury's finding as to whether the defendant was guilty of "first degree attempted murder," although attempted murder is not divided into degrees. (*Ibid*.) The jury found the defendant guilty of "first degree attempted murder" as to both counts. (*Ibid*.) At sentencing, the trial court imposed life imprisonment on the basis of the "first degree attempted murder" convictions. (*Ibid*.)

We held in *Arias* that the defendant's claim had not been forfeited and ordered the trial court to strike the section 664, subdivision (a) sentencing enhancements, remanding the matter for further sentencing. (*Arias*, *supra*, 182 Cal.App.4th at pp. 1021-1022.) We based our decision on the fact that the defendant was given no notice of the section 664, subdivision (a) enhancement, and we concluded "[t]his was no mere formal defect in information," but rather an omission that prejudiced a substantial right. (*Id*. at p. 1020.) We held that neither abuse of discretion nor harmless error standards of review were applicable, distinguishing the case from those in which the charging document was amended during trial. (*Ibid*.)

In *Houston*, our Supreme Court held the defendant forfeited his claim that his life sentences for attempted murder must be reversed because "defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated." (*Houston*, *supra*, 54 Cal.4th at p. 1228.) As in this case and *Arias*, the information failed to allege the attempted murders were deliberate and premeditated. (*Id*. at p. 1226.) Also like *Arias* and the

instant case, the trial court in *Houston* issued instructions that included willful, deliberate, and premeditated attempted murder. (*Id*. at p. 1227.) In contrast to *Arias*, however, the trial court in *Houston* issued verdict forms including willful, deliberate, and premeditated attempted murder as a special finding. (*Ibid*.) Additionally, during the presentation of the defendant's case, the court noted the defendant faced life imprisonment and asked the parties if there were any objections to the instructions or verdict forms. (*Ibid*.) Neither party objected. (*Ibid*.) The court instructed the jury as to willful, deliberate, and premeditated attempted murder and indicated that the verdict forms contained a special finding on the issue. (*Ibid*.) The jury expressly found the defendant guilty of willful, deliberate, and premeditated attempted murder, and the defendant was sentenced in accordance. (*Id*. at pp. 1227-1228.) The defendant did not object at any time. (*Ibid*.)

The *Houston* court distinguished *Arias* on the basis that in *Arias*, it was not clear when the jury instructions and verdict forms were issued, or whether the parties had discussed the issue of the section 664, subdivision (a) allegations, and the jury had not expressly found that the murders were willful, deliberate, and premeditated. (*Houston*, *supra*, 54 Cal.4th at p. 1229.) *Houston* reasoned that the defendant had fair opportunity to object to the instructions or jury forms at many times during the proceedings, but had failed to do so, depriving the trial court of the opportunity to hear argument on whether the information should be amended, and remedy the situation appropriately. (*Id*. at pp. 1227-1228.) Accordingly, *Houston* held that the defendant had forfeited his claim. (*Id*. at p. 1229.)

The circumstances here are the same. Although the information was inadequate, defendant had fair notice of the prosecutor's intent to pursue the finding and sufficient time to object. Counsel specifically discussed modifications to CALCRIM No. 601 prior to the close of the prosecution's case, but there were no objections to its inclusion. Because a minor modification was made, as noted above, it is clear the defense had actual notice of the instruction and therefore had notice of the allegations as well. There were numerous discussions regarding jury instructions, and counsel were specifically asked whether they objected to the verdict forms, which included the special findings.

26

Moreover, here the jury expressly found defendant guilty of willful, deliberate, and premeditated attempted murder in counts 3-6, whereas in *Arias*, the jury convicted the defendant of "first degree attempted murder," a crime which did not exist. We therefore hold that under the reasoning of *Houston*, defendant, here, has forfeited his claim that his four life sentences must be reversed due to defects in the charging document.

**IV.** *Joint and Several Liability on Direct Victim Restitution*

Defendant requests that we order the trial court to amend the awards of direct victim restitution against him and Casio to reflect the imposition of joint and several liability.

Defendant and Casio were tried together but sentenced separately. Casio was convicted of the same charges, with the exception that he was additionally convicted of felon in possession of a firearm. On July 10, 2011, the trial court ordered defendant to pay direct victim restitution in the amount of $38,530.89 to the Victim's Compensation Board, and $1,669.50 to Nicole Richards for out-of-court funeral expenses (§ 1202.4, subd. (f)).[10]

Defendant argues the order for restitution in his case should have been made joint and several with the order in Casio's case to avoid multiple reimbursement for a single expense, which would result in a windfall to the victims' families.

Defendant forfeited his claim by failing to object below. (*People v. O'Neal* (2004) 122 Cal.App.4th 817, 820.) "[A]ll 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review. [Citations.]" (*People v. Smith* (2001) 24 Cal.4th 849, 852 (*Smith*).) Relying on *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1533-1535

---

[10] Section 1202.4, subdivision (f), states in relevant part, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order. . . ."

(*Blackburn*), defendant argues the sentence was unauthorized, and as a result, his claim was not forfeited. Defendant's reliance is misplaced. First, *Blackburn* did not address forfeiture by failure to object, and "[i]t is axiomatic that an opinion does not stand for a proposition the court did not consider." (*People v. Taylor* (2010) 48 Cal.4th 574, 626.) Moreover, the unauthorized sentence exception only applies to sentences that could not be lawfully imposed under any circumstance, where it is unnecessary to review the factual findings of the trial court, and where there is no need to remand the matter to the trial court. (*Smith*, *supra*, at p. 852; *People v. Brach* (2002) 95 Cal.App.4th 571, 578.) The exception does not apply here.

Even if defendant had not forfeited his claim by failing to raise it, it is without merit. Although *Blackburn* held that a trial court has "the authority to order direct victim restitution paid by both defendants jointly and severally[,]" neither *Blackburn* nor the other cases defendant cites stand for the proposition that the court *must* order joint and several liability. (*Blackburn*, *supra*, 72 Cal.App.4th at p. 1535; see *People v. Neely* (2009) 176 Cal.App.4th 787, 800; *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1049-1052 (*Madrana*).)

Section 1202.4, subdivision (j) provides that restitution paid "shall be credited to any other judgments for the same losses obtained against the defendant arising out of the crime for which the defendant was convicted." "The court in *People v. Zito* [(1992) 8 Cal.App.4th 736, 745,] construed the term 'defendant' to include 'codefendants.' [Citation.] Thus if the combined payments made by multiple defendants exceed the victim's loss, each defendant would be entitled to a pro rata refund of any overpayment." (*People v. Arnold* (1994) 27 Cal.App.4th 1096, 1100 (*Arnold*).) Although *Arnold* discussed an earlier statute (Gov. Code, § 13967, subd. (c)), the language of the two versions of the law is sufficiently similar for its interpretation to be applicable here. (*Madrana*, *supra*, 55 Cal.App.4th at pp. 1050-1051.) Because the law protects defendant against overpayment to the victims, we conclude there was no error meriting a remedy on appeal.

28

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


KUMAR, J.[*]

---

[*] Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.