Filed 6/22/23  P. v. Ubiarco CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B319052 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. TA151057 |
| EDUARDO UBIARCO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Connie R. Quinones, Judge.  Affirmed in part, sentence vacated in part, and remanded with instructions.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Eduardo Ubiarco, Jr. of (1) the first degree murder of the mother of two of his four children, and (2) the attempted murder of her father. We vacate the indeterminate life sentence on the attempted murder conviction and remand the case for resentencing on that count. We affirm Ubiarco's convictions in all other respects.

**FACTS AND PROCEDURAL BACKGROUND**

1.    *The shootings on January 1, 2020*

Ubiarco and Claudia—also known as Janet—had been in a relationship for a number of years.[1] On New Year's Eve 2019 Claudia and her children Kayla and Edward[2] were at the Compton home of her parents and sister. Shortly before midnight, Ubiarco called Kayla (who was 10) on her cell phone. He told her "to take care of [herself] and [her] little brother and that he loved [her]." Kayla told Ubiarco not to do anything stupid because she didn't want him to go to jail.

Ubiarco arrived at the residence around 12:30 or 1:00 a.m. (By then it was January 1.) He went into the bedroom and "grabbed [Kayla] to take her away." Claudia tried to stop him. They argued. Claudia " 'swatted' " Ubiarco and scratched his face. Ubiarco slapped her back. Kayla started to cry. Claudia got between Ubiarco and Kayla. Claudia's father, Jesus Lopez Sanchez,[3] was able to get Kayla away from Ubiarco.

---

[1]    Ubiarco and Claudia were not married. Ubiarco testified at trial that the two considered themselves husband and wife.

[2]    Ubiarco also had two daughters from a previous relationship, Valeria and Karina.

[3]    To avoid confusion, we refer to Mr. Lopez Sanchez as Jesus.

Jesus's sister-in-law told Ubiarco to leave.  Ubiarco left the house and went out to the street.  Jesus and Claudia went out to the front yard.  Ubiarco went to the car and came back with a gun.  He was holding the gun in front of his chest.

Claudia threw a paving stone at Ubiarco and it hit him in the forehead.  Blood was dripping from Ubiarco's forehead and he looked pale; "[he] didn't look right."  From less than a foot away, Ubiarco shot Jesus in the chest twice.  Ubiarco then shot Claudia.

Sometime very early on the morning of January 1, Ubiarco spoke by phone with his friend Matthew Ruiz.  Ubiarco told Ruiz "that he did it"; he "told [Ruiz] to take care of his kids."

Claudia and Jesus were transported to the hospital in the same ambulance.  Jesus was in the hospital for three weeks.  "They had to remove a kidney, and part of [his] liver and colon were damaged."  Claudia had surgery but did not survive.  An autopsy revealed three gunshot wounds.  One of those was fatal.  The bullet entered through the victim's left armpit, traveled through the body, and exited the right flank.  The bullet traveled "through some major organs:  the lung, the liver, the stomach."  It also passed through "two of the largest blood vessels in the body: the aorta and the vena cava."

**2.     *The charges, trial, verdicts, and sentences***

The People charged Ubiarco with the murder of Claudia (count 1) and the attempted murder of Jesus (count 2). The People alleged Ubiarco personally used a firearm in the commission of the crimes,[4] and personally inflicted great bodily injury on Jesus.

---

[4]      The People's original information, filed October 21, 2020, alleged Ubiarco personally used and personally and intentionally discharged a firearm causing death and great bodily injury to

The case went to trial in October 2021.  The People presented evidence of previous incidents under Evidence Code sections 1109 and 1101, subdivision (b):

Toni Guajardo met Claudia at a pet clinic where they both worked as receptionists.  They had worked together for four or five years.  Guajardo saw Ubiarco at the clinic "[a]lmost every day."  When he came into the clinic, "[h]e would sit down and watch [Claudia]."  Ubiarco also called the clinic "nonstop."  He sat outside the clinic "[a] lot" in his work van or his car.  Guajardo saw him out there "[p]robably like 50 to a hundred times," "[m]aybe more over the years."  Eventually the clinic owner asked Ubiarco not to come there anymore.

After Thanksgiving in 2019, Guajardo saw Claudia with "bruises on her face"—"bruises everywhere"—and a black eye.  Around the second week of December, Claudia started staying at Guajardo's home.  On a Saturday in mid-December, Guajardo and Claudia met at the White Harte Pub in Woodland Hills.  Claudia was crying.  Guajardo went to the restroom; when she returned Ubiarco was sitting in her seat at the bar.  Claudia "looked scared."  Ubiarco grabbed Claudia's purse and car keys and walked out of the pub.

Ubiarco paced back and forth outside, then "went and sat in his car waiting for [the two women] to come out."  He "came back a couple of times threatening."  The women called the police but the police never came.  Ubiarco was still parked outside the pub when it closed at 2:00 a.m.  Guarjardo called a friend to come

the victims.  On October 8, 2021, the People filed an amended information alleging only the use of a firearm.

4

pick them up; they "ended up having to sneak out" "a side entrance."

Soledad Bermudez had known Claudia (whom she called Janet) for more than 19 years. Soledad and her husband Gilberto Bermudez hung out with Ubiarco and Claudia every week or two. Gilberto described Ubiarco as "very jealous, a bit possessive." Ubiarco asked Gilberto "why do I let my wife go out"—"who knows what they are doing and stuff like that." That was "pretty much a theme" over the 10 years Gilberto knew Ubiarco.

Ubiarco told Gilberto he believed Claudia was cheating on him. Ubiarco said "he would never allow her to move on," "to have anybody so that her kids would never call anybody else dad." After Thanksgiving 2019, Ubiarco told Gilberto he'd hit Claudia. The reason was "[j]ust jealousy." Gilberto told Ubiarco to "let it be, let her go." "There's no need to be physical."

Andrew Rey met Claudia at the pet clinic. In about October of 2019 their relationship became romantic. On the night of Thanksgiving 2019, Rey and Claudia met up. Claudia was crying. "She had a big ol' bump on the back of her head." When Rey touched the bump, Claudia said, " 'Ow.' "

On the day after Christmas, Rey and Claudia went to a mall. Ubiarco pulled up, got out of his vehicle, and told Claudia to go home. Rey told Ubiarco to leave Claudia alone. Ubiarco started coming toward Rey. Rey saw Ubiarco had a knife. Rey ran toward a store. When Rey and Claudia came out of the store about 30 minutes later, the tires of Claudia's car had been "stuck"—"there were holes in them."

Ubiarco testified on his own behalf at trial. On New Year's Eve, Ubiarco said, Claudia went to her aunt's house with her children. Ubiarco and his daughter Karina went to the home of

his friend Matthew Ruiz. Ubiarco felt sad because he "was losing [his] family." Around 8:00 p.m. that evening, he posted a "story" on Snapchat of himself listening to a song in which a man kills his unfaithful partner.

Around 11:30 p.m. Karina received a message from Kayla that screen shots she'd seen on Claudia's phone "made her sad" and she wanted Ubiarco to come and pick her up. Ubiarco and Karina left Northridge around 11:45 p.m. Ubiarco took his gun with him because he carried it "[e]very time" he went to Compton or "anywhere in the city" of Los Angeles. Ubiarco called Claudia 22 times while driving from Northridge to Compton.

When Ubiarco arrived at the Compton residence he was not able to get Kayla. "She was taken from me." Ubiarco testified Claudia hit him with a broom handle on his head, back, and face. He was "kind of being like shoved towards the front door." Then Claudia picked up "a paver, a brick," and threw it at his face. He was "stunned," "like dazed." He was bleeding a lot.

Ubiarco testified, "I was bleeding and my only thing was to try to get out of there, you know." So "I just fired off some rounds with my gun." Ubiarco denied having gone to the car to get the gun. He said he was not trying to kill Claudia or Jesus. Karina "guided" Ubiarco toward his car across the street and he was able to drive home. He changed his shirt "because it was all bloody" and "tossed [his gun] in the neighbor's trash can."

On cross-examination Ubiarco admitted he'd slapped Claudia on Thanksgiving and that he was responsible for the bruising to her eye that resulted.

Ubiarco called his mother, Blanca Parks, as a witness. On cross-examination, Parks admitted she'd once heard Ubiarco tell Claudia "he was going to have Karina fuck her ass up."

6

The jury convicted Ubiarco on both counts and found the firearm use and infliction of great bodily injury allegations true. The jury found Ubiarco's murder of Claudia to be first degree murder. As discussed below, as to the attempted murder of Jesus, the jury wrote "First" on a line on the verdict form that read, "We further find the murder [*sic*] to be of the _____ FIRST or SECOND (Indicate One) degree."

The trial court sentenced Ubiarco to 49 years to life in the state prison, calculated as 25 years to life on count 1 plus three years for the firearm use, and 15 years to life on count 2, plus three years for the firearm use and three years for the great bodily injury enhancement. The court ordered the sentences on counts 1 and 2 to be served consecutively.

## DISCUSSION

### 1. *The trial court prejudicially erred by failing to give the jury CALCRIM No. 601*

Ubiarco contends he must be resentenced to a determinate term on count 2 for attempted murder because the court failed to instruct the jury on any allegation that the crime was done willfully and with deliberation and premeditation. We agree.

Penal Code section 664, subdivision (a)[5] provides attempted murder shall be punished by imprisonment in the state prison for five, seven, or nine years "unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact." Here, count 2 of both the original information and the amended information charged Ubiarco with the attempted

---

[5] References to statutes are to the Penal Code unless otherwise noted.

7

murder of Jesus.  There was no allegation in the information that the attempted murder was willful, deliberate, and premeditated.  Nor did the prosecution ever seek to amend its information to add that allegation.

CALCRIM No. 600 is entitled "Attempted Murder."  CALCRIM No. 601 is entitled "Attempted Murder: Deliberation and Premeditation."  The Bench Notes for that instruction state: "***Instructional Duty***[.] [¶] The court has a **sua sponte** duty to give this instruction defining the elements of the sentencing enhancement.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 475-476, 490; Pen. Code, § 664(a).)  Give this instruction when an enhancement for deliberation and premeditation is charged.  [¶] This instruction **must** be given with CALCRIM No. 600, *Attempted Murder*."

When the court discussed proposed jury instructions with counsel, it stated it intended to give both CALCRIM No. 600 and CALCRIM No. 601.  However, the court never read CALCRIM No. 601 to the jury, nor was that instruction included in the packet of written jury instructions.  Neither the prosecutor nor defense counsel brought this omission to the court's attention.

Moreover, the court did not give the jury "not guilty" and "guilty" verdict forms for count 2, with a place on the "guilty" verdict form for the jury to find true or not true the allegation that the attempted murder was willful, deliberate, and premeditated.  Instead, the court gave the jury "not guilty" and "guilty" verdict forms for that count with a line that read, "We further find the murder [*sic*] to be of the _____ FIRST or SECOND (Indicate One) degree."  The jury wrote "First" on the line.

8

*People v. Arias* (2010) 182 Cal.App.4th 1009 (*Arias*) governs this case.  There, the charging document alleged the defendant, with malice aforethought, attempted to murder two victims.  But it did not allege the attempted murders were willful, deliberate, and premeditated.  "Nevertheless, the trial court instructed that if the jury found defendant guilty of attempted murder, it must make a separate determination of whether the prosecution proved the attempted murder was done willfully and with premeditation and deliberation.  The jury's attempted murder verdicts did not include special findings as to premeditation and deliberation, but found 'first degree attempted murder' as to both victims."  (*Id*. at p. 1017, fn. omitted.)

As our colleagues in Division 5 pointed out in *Arias*, "California law does not define attempted murder in terms of degrees."  (*Arias*, *supra*, 182 Cal.App.4th at p. 1011, fn. 2.  See *People v. Lee* (2003) 31 Cal.4th 613, 616 [section 664, subdivision (a) "does not create a greater degree of attempted murder, but rather constitutes a penalty provision increasing the punishment for attempted murder beyond the maximum otherwise prescribed"].)  Accordingly, the *Arias* court concluded, the defendant's section 664, subdivision (a) sentence enhancements had to be stricken as to his attempted murder convictions and the matter remanded for resentencing on those counts.  (*Arias*, at p. 1021.)

The Attorney General contends Ubiarco forfeited his claim that the failure to instruct and the erroneous verdict forms violated his rights.  The *Arias* court rejected a similar forfeiture argument, noting, "the imposition of a sentencing enhancement based on an unpled enhancement allegation in violation of statutory pleading requirements amounted to an unauthorized

9

sentence." (*Arias*, *supra*, 182 Cal.App.4th at p. 1017. See also *People v. Perez* (2017) 18 Cal.App.5th 598, 614-618.)

Nor does the Attorney General's reliance on *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*) have merit. In that case, the defendant was charged with (among other crimes) 10 counts of attempted murder. The indictment did not allege the crimes were deliberate and premeditated. At the end of the first day of the defense case, the court gave counsel drafts of the verdict forms and pointed out the issue. The court then properly instructed the jury that, if it found the defendant guilty on those counts, it must determine whether the attempted murders were willful, deliberate, and premeditated. (*Id.* at pp. 1225-1226.)

In *Houston* and *Arias*, the trial courts at least properly instructed the jury. (*Houston*, *supra*, 54 Cal.4th at p. 1226; *Arias*, *supra*, 182 Cal.App.4th at p. 1017.) Here, by contrast, the court did not give CALCRIM No. 601, an instruction it had a sua sponte obligation to give, defining the terms "willfully," "deliberated," and "premeditation." Nor did the verdict form contain any place for the jury to find true or not true any allegation (which the prosecution never pleaded) that the attempted murder was willful, deliberate, and premeditated, as section 664, subdivision (a) explicitly requires. This is not simply an issue of notice. As the bench note to CALCRIM No. 601 states, a finding by the trier of fact—here, the jury— that the crime was willful, deliberate, and premeditated is required by *Apprendi v. New Jersey*, *supra*, 530 U.S. 466 and its progeny.

Accordingly, we vacate Ubiarco's sentence on count 2 and remand the matter for resentencing on that count to a determinate term. (See *Arias*, *supra*, 182 Cal.App.4th at

pp. 1012, 1021 [section 664, subdivision (a) enhancement stricken; life sentences "set aside"; matter remanded for defendant to "be resentenced to a determinate term as prescribed by law"].)

## 2. *The court was not required to instruct on accident*

Ubiarco contends the trial court erred by denying his counsel's request to give the jury CALCRIM No. 3404, "Accident (Pen. Code, § 195)." While somewhat unclear, it appears Ubiarco contends he was entitled to an "accident" instruction only on count 2, the attempted murder of Jesus. That contention is without merit.

CALCRIM No. 3404 was among the instructions the defense requested in a list it filed with the court. After both sides had rested, the court apparently discussed jury instructions informally with counsel off the record. Back on the record, the court listed the instructions it intended to give. As for an instruction on accident, the court stated, "3404 was requested by the defense. That's denied. I don't think there's any evidence that this was an accident."

Section 195 provides, "Homicide is excusable in the following cases: [¶] 1. When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." Section 26 provides, "All persons are capable of committing crimes except those belonging to the following classes: . . . Five—Persons who committed the act . . . charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." CALCRIM No. 3404, in the paragraph that applies to specific or general intent crimes (as opposed to negligence), states, "The defendant

11

is not guilty of _____ *<insert crime[s]>* if (he/she) acted . . . without the intent required for that crime, but acted instead accidentally.  You may not find the defendant guilty of _____ *<insert crime[s]>* unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."

Trial courts have a duty to instruct juries in criminal cases on those principles of law necessary to assist them in understanding the case.  (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  A trial court should give an instruction when the record contains substantial evidence from which a jury reasonably could conclude—as relevant here—that the defendant has a defense to the charge.  (*People v. Barton* (1995) 12 Cal.4th 186, 201.)  Substantial evidence is evidence sufficient to deserve consideration by the jury—that is, evidence that a reasonable jury could find persuasive.  (*Id.* at p. 201, fn. 8; *People v. Johnson* (2019) 32 Cal.App.5th 26, 41.)

Courts must determine whether sufficient evidence supports an instruction without reference to the credibility of that evidence.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  Doubt as to the sufficiency of the evidence to warrant a particular instruction should be resolved in the defendant's favor.  (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)  However, the court need not give instructions based solely on conjecture and speculation.  (*People v. Day* (1981) 117 Cal.App.3d 932, 936.  Cf. *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1410 [no duty to instruct when evidence is "minimal and insubstantial"].)

"We conduct independent review of issues pertaining to instructions."  (*People v. Cooksey*, *supra*, 95 Cal.App.4th at p. 1411.)

Here, Jesus testified at trial that Ubiarco came to his house around 12:30 or 1:00 a.m. on the date in question. Ubiarco and Claudia were "fighting," "arguing," and Jesus told them both to leave. Ubiarco went out to the street and came back with a gun. Ubiarco came toward Jesus and Claudia with the gun in his hand. Claudia threw a paving stone at Ubiarco. Ubiarco then shot Jesus in the chest "[l]ike twice" from "[l]ess than a foot" away.

Ubiarco argues his own testimony "that he was not attempting to kill [Jesus] when he fired" was "by itself" "adequate to support the instruction." On direct examination, Ubiarco testified that, after Claudia threw the paver at him, he "was bleeding and my only thing was to try to get out of there, you know." Ubiarco's counsel asked him, "What did you do?" Ubiarco replied, "I just fired off some rounds with my gun." Ubiarco said he was not trying to kill Claudia. When his lawyer asked him, "Were you trying to kill her father?", Ubiarco responded, "Of course not."

Ubiarco never testified that his gun discharged accidently, or that he pulled the trigger—five times[6]—without meaning to. To the extent Ubiarco's testimony that he "fired off some rounds" "to try to get out of there" is understandable, Ubiarco was not asserting a defense of accident. He was asserting a defense of self-defense, including imperfect self-defense. The court instructed the jury on self-defense (CALCRIM Nos. 505, 3470) and imperfect self-defense (CALCRIM Nos. 571, 604).

---

[6]     As noted, the autopsy of Claudia revealed she'd been shot three times.

13

Testimony that a defendant shot a victim (Jesus) twice in the chest at very close range—two volitional acts—is not substantial evidence giving rise to a duty to instruct the jury on accident. The court did not err in refusing Ubiarco's request for CALCRIM No. 3404.

3. ***The court did not err in its jury instructions on provocation; in any event, any error was harmless***

Ubiarco contends several instructions given to the jury on the role of provocation were incorrect or inadequate. We find no prejudicial error.

As we noted, the defense filed with the court a list of instructions it was requesting. That list included CALCRIM Nos. 520 ("First or Second Degree Murder with Malice Aforethought"), 521 ("First Degree Murder"), 522 ("Provocation: Effect on Degree of Murder"), 570 ("Voluntary Manslaughter: Heat of Passion— Lesser Included Offense"), and 571 ("Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense"). The list did not include CALCRIM No. 603 ("Attempted Voluntary Manslaughter: Heat of Passion—Lesser Included Offense").

CALCRIM No. 522 states,

> "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in

14

deciding whether the defendant committed murder or manslaughter.]"

As Ubiarco points out, the bench note for the instruction states, "If the court will be instructing on voluntary manslaughter, give both bracketed portions on manslaughter." However, the trial court did not include those bracketed portions in the version of CALCRIM No. 522 it read to the jury and provided in the packet of instructions. The list of requested instructions the defense filed did not address—one way or the other—whether the court should include those portions. Nor was there any discussion of the bracketed language at the instruction conference. Neither the prosecutor nor defense counsel brought to the court's attention the omission of the bracketed phrases.

While the defense did not include CALCRIM No. 603 in its filing, it did request that instruction at the conference. Counsel said, "603 I would be requesting. Voluntary manslaughter heat of passion, a lesser included offense." The prosecutor objected: "I don't believe that the evidence supports an inference of that." The court stated, "The court is going to deny that request. There is not substantial evidence as to self-defense for [Jesus] Lopez."

Defense counsel attempted to tell the court the instruction had to do with heat of passion, not self-defense. The court repeated, "Not giving it." Nevertheless, the court *did* read CALCRIM No. 603 to the jury and it appears to have been included in the packet of written jury instructions.

CALCRIM No. 522 "is a pinpoint instruction, to be given on request." (Bench Notes to CALCRIM No. 522. See *People v. Rogers* (2006) 39 Cal.4th 826, 877-878.) Because the court instructed on voluntary manslaughter, it should have included the bracketed portions referring to manslaughter. But the court

15

did instruct the jury in CALCRIM No. 570 that provocation could reduce "[a] killing that would otherwise be murder" to voluntary manslaughter. Thus, in giving both CALCRIM No. 522 and CALCRIM No. 570, the court told the jurors provocation could reduce first degree murder to second, and murder to manslaughter. We consider the instructions as a whole and assume the jurors are intelligent people capable of understanding and correlating all the instructions. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

In short, the record does not support Ubiarco's contention that "[t]he instructions on murder and attempted murder . . . permitted the jury to convict without any consideration of the role of provocation." Defense counsel devoted a considerable portion of her closing argument to provocation. CALCRIM No. 570 instructed the jury, "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion." Read together, the instructions told the jury it was the prosecution's burden to prove, beyond a reasonable doubt, that Ubiarco acted with the requisite intent, rather than in the heat of passion.

In any event, on this record, the court's omission of the bracketed phrases in CALCRIM No. 522 was harmless. It is not probable Ubiarco would have received a more favorable result had the court included those portions of the instruction. Mere misdirection of the jury is subject to the uniform standard of reversible prejudice and a miscarriage of justice applicable under our Constitution. (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 156, fn. 6, 175, citing Cal. Const., art. VI, § 13.)

16

Nor is there merit to Ubiarco's contention that CALCRIM Nos. 570 and 603 "contain obvious errors." Ubiarco notes those instructions say, in order for heat of passion to reduce a murder or attempted murder to manslaughter or attempted manslaughter, "the defendant must have acted under the direct and immediate influence of provocation as I have defined it." But, Ubiarco complains, the instructions "never provide a definition of that term."

In seeking a specific definition of the word "provocation," Ubiarco reads the instructions too narrowly. The instructions explain the crime may be reduced to a lesser if the defendant acted "because of a sudden quarrel or in the heat of passion." The instructions further explain the defendant so acted if he was provoked and acted "rashly and under the influence of intense emotion," provided that same provocation would have caused "a person of average disposition" so to act as well. The instructions then explain, "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." (CALCRIM Nos. 570, 603.)

The bench notes use the terms "provocation" and "heat of passion" almost interchangeably. The concepts are two sides of the same coin. In other words, "provocation" is anything that caused the defendant (and would cause a "person of average disposition") to react with a "violent or intense emotion that causes a person to act without due deliberation and reflection." We see no error in these instructions, which have been in use since 2006.

17

**4.** ***New Evidence Code section 352.2 does not assist Ubiarco***

    a.    *The Snapchat post*

At the outset of trial, Ubiarco's counsel filed a motion in limine to exclude Ubiarco's post on Snapchat of the song "El Asesino" (The Assassin) by the band Los Cadetes de Linares. The post on "king_edward213's Story" shows the right foot of a person and a mobile phone on a countertop with a screen shot. A group singing in Spanish can be heard. The clip lasts 36 seconds. Counsel argued the recording lacked foundation and it was "unduly prejudicial in comparison to its very marginally probative value."

At the hearing on motions in limine, the prosecutor told the court she was "planning on using" the song with one of her witnesses. The court "read through the transcript of the lyrics of the song" over the lunch hour. The prosecutor told the court she'd be able to establish a foundation. The court stated its tentative decision was to admit the exhibit, as "[i]ts probative value exceeds the prejudicial effect."

At trial, Soledad Bermudez testified Claudia and Ubiarco had a joint Snapchat account under the name "King Eduardo." On January 1, 2020, Soledad saw a story on that account and opened it. The prosecutor distributed transcripts of the post, in Spanish and English, to the jurors.[7] Soledad testified the story

---

[7]    The transcript contained the following lyrics in Spanish and an English translation:

"Me dicen el Asesino por alli, y dicen me anda buscando la ley porque mate de manera legal la que burio mi querer. En un momento de celos mate, segado de sentiment y dolor, la que burlara mi honra y mi ser, mi vida y mi corazon. Ya esta en

18

had been posted sometime between 7:00 and 8:00 p.m. the night before, December 31.

On direct examination in the defense case, Ubiarco testified he'd posted the video on Snapchat. He said, "It's just one of my

---

el cielo juzgada de Dios. Si alla de lo alto si acaso me ve, sabra la ingrata que tuve razon, sabra cuanto la adore.

"Veinte anos que de sentencia me den, con gusto voy mi delito a pagar, pero antes quiero vengarme tambien del que me hizo criminal. Va la justicia buscandome a mi, mas no me entrego hasta ver la occasion de ver al otro que me hizo infeliz y abririe su corazon. Veinte anos que de sentencia me den, con gusto voy mi delito a pagar, pero antes quiero vengarme tambien del que me hizo criminal. Va la justicia buscandome a mi, mas no me entrego hasta ver la occasion de ver al otro que me hizo infeliz y abrirle su corazon."

Translation:

"They call me the Assassin around there, and they say the law is looking for me because I killed in a legal manner the one who betrayed my love. In one moment of jealousy I killed, blinded by emotion and pain, the one who betrayed my honor and my being, my life, and my heart. She's in heaven now judged by God. If from the heavens perhaps she sees me, the ingrate will know I was right, she'll know how much I adored her.

"If they sentence me to 20 years, I will gladly pay for my crime, but before, I want to take revenge also on the one who made me a criminal. The law is looking for me, but I will not turn myself in until I see the occasion of seeing the other one who made me unhappy and open his heart. If they sentence me to 20 years, I will gladly pay for my crime, but before, I want to take revenge also on the one who made me a criminal. The law is looking for me, but I will not turn myself in until I see the occasion of seeing the other one who made me unhappy and open his heart."

songs by my favorite groups.  It came on and I just posted it."
He continued, "I think it was on Pandora or something like that.
[¶] . . . The phone was just there on the counter.  It was playing
music.  They were allowing me to change the music because
they knew I was sad so they were just trying to comfort me,
you know."  When asked whether he'd "look[ed] for the song,"
Ubiarco replied, "[I]t just came on."

On cross-examination, the prosecutor asked Ubiarco why
the song was one of his favorites.  Ubiarco replied, "I just like the
beat . . . to it and that's one of my favorite groups."  When asked
if he understood the song "was about a man killing his romantic
partner," Ubiarco said, "Right, yes."

      b.     *Evidence Code section 352.2*

Last year, the Legislature passed and the governor signed
Assembly Bill No. 2799 (2021-2022 Reg. Sess.) (Stats. 2022,
ch. 973, § 2) (Assembly Bill 2799).  The new law took effect
January 1, 2023.  The bill added section 352.2 to the Evidence
Code.  (*People v. Venable* (2023) 88 Cal.App.5th 445, 448, 454
(*Venable*), review granted May 17, 2023, S279081.)
Subdivision (a) provides,

> "In any criminal proceeding where a party
> seeks to admit as evidence a form of creative
> expression, the court, while balancing the
> probative value of that evidence against the
> substantial danger of undue prejudice under
> [Evidence Code] Section 352, shall consider,
> in addition to the factors listed in Section 352,
> that:  (1) the probative value of such expression
> for its literal truth or as a truthful narrative is
> minimal unless that expression is created near

in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).)

"The Legislature made this change to address the problem of introducing racial stereotypes and bias into criminal proceedings by allowing rap lyrics into evidence." (*Venable*, *supra*, 88 Cal.App.5th at p. 454.) The Legislature stated, "Existing precedent allows artists' creative expression to be admitted as evidence in criminal proceedings without a sufficiently robust inquiry into whether such evidence introduces bias or prejudice into the proceedings." (Stats. 2022, ch. 973, § 1(a).) The Legislature expressed its "intent . . . to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias . . . ." (*Id*. at § 1(b).)

The *Venable* case involved a shooting by Venable, the driver, and his fellow gang member, the shooter, of a rival gang member. The prosecution introduced into evidence "a rap video" the police found on YouTube "featuring Venable's younger brother." Venable and fellow gang members could be seen

21

flashing gang signs and displaying guns, drugs, and money in the video. The rap lyrics referred to a shooting and used racial slurs. (*Venable*, *supra*, 88 Cal.App.5th at pp. 447, 452-453.)

The appellate court held Assembly Bill 2799 was retroactive to cases not yet final. The court noted the evidence—apart from the video—of Venable's involvement in the crime was "not strong." The court concluded "the admission of the rap video without the new safeguards was prejudicial," reversed Venable's conviction, and remanded for a new trial. (*Venable*, *supra*, 88 Cal.App.5th at pp. 456, 458.)

On May 17, 2023, our Supreme Court granted the Attorney General's petition for review in *Venable*. (S279081.) The high court stated it was holding *Venable* for the lead cases of *People v. Bankston*, S044739, and *People v. Hin*, S141519.[8] The court noted those cases "include an issue involving the retroactivity of the provision in Assembly Bill No. 2799 (Stats. 2022, ch. 973) limiting the admissibility of creative expressions."

      c.     *Application of the new statute to this case*

Ubiarco contends the passage of Assembly Bill 2799 requires the reversal of his convictions on both counts. He asserts the term " 'creative expression' " includes "creative expression merely *shared* or *reposted* by the defendant." He argues "[t]he theme of this evidence could be taken to imply that Latinos as a group are prone to some sort of violent overreaction to romantic discord."

---

[8]     *People v. Bankston* is a death penalty case dating back to 1995. It seems to be before our high court on habeas. *People v. Hin* is also a death penalty case, dating back to 2006 and now on direct appeal.

We are not persuaded.  Even if we assume for argument's sake (without deciding) that newly-effective Evidence Code section 352.2 applies retroactively to cases not yet final, we are doubtful that the statute extends to a defendant's posting on social media of the creative expression of an artist completely unrelated to the defendant.  As we noted, our Legislature spoke of "an *accused person's* creative expression" as the focus of the legislation.  Here, Ubiarco merely posted video of himself listening to a song by a popular group; he neither created nor participated in that creative expression.

In any event, even if the new statute could be read so broadly, exclusion of the video would not have been required here.  Ubiarco posted the video between 7:00 and 8:00 p.m.; he shot and killed Claudia five to six hours later.  Accordingly, Ubiarco's posting was "near in time to the charged crime." (Evid. Code, § 352.2, subd. (a).)  Its subject matter—the killing of the woman "who betrayed my love"—bore "a sufficient level of similarity to the charged crime."  (*Ibid*.)  The Snapchat "story" Ubiarco posted contained neither rap lyrics nor " ' "other creative expressions [that] get used as 'racialized character evidence . . . in insidious ways' " ' " by prosecutors.  (*Venable, supra*, 88 Cal.App.5th at p. 454.)  Other evidence tying Ubiarco to the crime was not weak—it was overwhelming:  he admitted he shot Claudia and Jesus.

23

## DISPOSITION

We vacate Eduardo Ubiarco, Jr.'s sentence on count 2 and remand the matter for resentencing to a determinate term. We affirm Ubiarco's conviction in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.